UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAYMOND DELEON MARTINEZ, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-1994 |
| | § | |
| WILLIAM  STEPHENS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In 1984, a jury first convicted Raymond Deleon Martinez of capital murder.  In the subsequent decades, Martinez has extensively litigated in both state and federal court.  During that time, Martinez has faced one retrial of his conviction and two retrials of his sentence. Relevant to the matters now before the Court, a jury in 2009 again answered Texas' special-issue questions in a manner requiring the imposition of a death sentence.

Martinez has filed a federal petition for a writ of habeas corpus challenging his death sentence.  Martinez raises four grounds for relief, only one of which he presented in state court. Respondent William Stephens has filed an answer.  After considering the record, the pleadings, and the applicable law—with particular emphasis on the operation of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA")—the Court finds that Martinez has not shown an entitlement to habeas relief.  The Court will deny Martinez's petition.  The Court will not certify any issue for appellate review.

## BACKGROUND

This Court has already once considered, and rejected, legal challenges to the trial of Martinez's guilt.  Martinez comes before the Court as one lawfully convicted of capital murder.

Because the instant federal petition only raises issues relating to Martinez's death sentence, the Court will succinctly summarize the underlying crime.

As part of a violent crime spree in July 1983, Martinez and his accomplices entered the Long Branch Saloon in Houston, Texas with the intention of committing robbery. During a violent confrontation, Martinez shot the unarmed manager Herman Chavis multiple times. Martinez later boasted that he "had to unload . . . his whole gun on the fat dude." Tr. Vol. 21 at 86.[1] Over a ten-day period, Martinez would kill four more people—including his own sister—before his arrest.

A jury first convicted Martinez of capital murder in 1984. The succeeding years have brought numerous legal challenges, twice requiring retrial. In 1988, the Texas Court of Criminal Appeals overturned Martinez's conviction and sentence because of jury-selection error. *Martinez v. State*, 763 S.W.2d 413 (Tex. Crim. App. 1988). A retrial in 1989 resulted in another capital conviction and death sentence. The Court of Criminal Appeals affirmed on direct appeal and denied his application for state habeas corpus relief. *Martinez v. State*, 867 S.W.2d 30 (Tex. Crim. App. 1993); *Ex parte Martinez*, No. 42,342-01 (Tex. Crim. App. 1999). Martinez then filed a federal habeas petition challenging his conviction and sentence. After significant factual development and an evidentiary hearing, this Court denied habeas relief. *Martinez v. Dretke*, 4:99-cv-3147. The Court of Appeals for the Fifth Circuit partially granted Martinez's request for a Certificate of Appealability, but eventually denied relief on all federal claims. *Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005). The United States Supreme Court denied certiorari review. *Martinez v. Dretke*, 546 U.S. 980 (2005).

---

[1] Through the decades of judicial review, the state court proceedings have resulted in a voluminous record. The Court will cite the Clerk's Record containing trial court motions and docket entries as Clerk's Record at ___. The reporter's record containing third punishment hearing will be cited as Tr. Vol. ___ at ___. The Court will refer to the record from Martinez's most-recent state habeas proceedings as State Habeas Record at ___. Citations to the transcript of the August 29, 2012 state habeas hearing will appear as Writ Hearing at ___.

In 2007, the Court of Criminal Appeals ordered a new sentencing hearing because the jury instructions had failed to provide an adequate vehicle to consider Martinez's mitigating evidence. *Ex parte Martinez*, 233 S.W.3d 319 (Tex. Crim. App. 2007).  At age 62, Martinez again faced a death-penalty trial.  Jurors would have to answer three special-issue questions: (1) did Martinez kill deliberately; (2) would Martinez be a future societal danger and (3) did sufficient circumstances militate against the imposition of a death sentence.  Clerk's Record at 4709-11; Tex. Code Crim. Pro art. 37.0711 §3(b), 3(e).  Martinez's attorneys[2] faced a staggering task in defending against a death sentence.  Given the prior sentencing hearings, the defense knew that the prosecution would call witness after witness to recount Martinez's life-long violent acts.  To summarize their testimony, Martinez first entered state custody after a statutory rape conviction at age 15.  Martinez afterwards only spent a few months in free society before returning to juvenile custody for committing theft.  Martinez escaped, but was recaptured.  Only a month after his release at age 18, he committed a burglary that resulted in a two-year sentence in the Texas Department of Corrections.  Martinez later served a lengthy incarceration for offenses such as armed robbery and theft of an automobile.

Martinez's violent behavior continued unabated behind bars.  Martinez attacked other inmates with little provocation.  He stabbed three inmates, possessed contraband such as marijuana, and tried to escape.  Prison records described Martinez as "an organizer and leader of the Texas Syndicate . . . [who] killed those who opposed the formation of said organization. . . . [H]e was . . . chronically violent physically and verbally and would attack others with little provocation."  Tr. Vol. 29 at 97; Tr. Vol. 38 at 77.

After his parole in 1982, Martinez relentlessly continued his lawlessness.  Martinez's

---

[2]     Jerome Godinich, Jr., Diana Olivera, and Amy Martin represented Martinez in the 2009 retrial of his sentence.  The Court will refer to these attorneys collectively as "trial counsel."

brief time in free society was marked by intermittent care in mental-health facilities, at times because he feigned mental illness.  He refused to work and bragged that he had committed numerous robberies.  He stole cars.  He threatened others with weapons.  He tried to enter the narcotics trade and killed a man who sold him precursor chemicals for drugs.

On July 11, 1983, Martinez began the violent crime spree that ended in the murder for which the jury convicted him.  With his accomplices, Martinez committed violent armed robberies.  After a disagreement, Martinez killed his sister and her boyfriend.  He killed a prostitute because she was "trying to get slick" with him and "he didn't like her."  Tr. Vol. 19 at 26; Tr. Vol. 21 at 133; Tr. Vol. 38 at 77.  The police arrested Martinez on July 23, 1983.

Throughout the decades of subsequent incarceration, Martinez's behavior did not improve.  Between 1986 and 2005 he committed thirty-four documented disciplinary incidents, including sixteen assaults on correctional officers.  He assaulted other inmates.  He incited others to violence.  He would spit at officers after minor inconveniences.  He claimed to have gang connections that could extend to the outside world.  In extremely graphic terms, he described raping other inmates.  He referred to himself as a "psychopath."  Tr. Vol. 25 at 167.  Even when housed in the most secure areas of a facility, he would bypass security measures to assault other inmates.

In all, Martinez claimed to have "murdered at least 8 people."  Tr. Vol. 38 at 77.  Martinez "ha[d] little remorse and appear[ed] to place the blame on others."  Tr. Vol. 29 at 62; Tr. Vol. 38 at 77.  With that lengthy, detailed, and extremely incriminating background, the prosecution had an overwhelmingly strong case for finding that Martinez would be a future danger to society.

Martinez's attorneys came to his third sentencing hearing with a full awareness of what

evidence both the State and the defense had previously presented.  Trial counsel's case for a life sentence emphasized mitigating factors in Martinez's background.  Martinez grew up in a family of migrant workers with a mother who suffered from mental illness.  Martinez himself had a history of paranoia, panic attacks, and anxiety.  As a child, Martinez developed a reputation for "being crazy."  Tr. Vol. 26 at 90.  Mental-health experts eventually diagnosed him with schizophrenia.  He suffered from physical conditions such as headaches and stomach problems throughout his life.  Witnesses from some of the robberies that ended in death testified that they had not actually seen who had pulled the trigger, potentially lessening Martinez's culpability.  Trial counsel also argued that, despite his past behavior, his age would influence whether he would constitute a future danger.

For the third time, the jury answered Texas' special issues in manner requiring the imposition of a death sentence.

Through appointed counsel, Martinez challenged his third death sentence on automatic direct appeal to the Texas Court of Criminal Appeals.  On December 15, 2010, the Court of Criminal Appeals affirmed in a published decision.  *Martinez v. State*, 327 S.W.3d 727 (Tex. Crim. App. 2010).  The United States Supreme Court denied Martinez's petition for writ of certiorari. *Martinez v. Texas*, ___ U.S. ___, 131 S. Ct. 2966 (2011).

Under Texas law, state appellate and habeas review run concurrently.  Through appointed habeas counsel,[3] Martinez filed a state habeas application raising ten grounds for relief.  With relevance to the instant proceedings, one of Martinez's claims argued that he "is ineligible for the death penalty under *Atkins v. Virginia* because he is mentally retarded with an IQ of 65" and that "trial counsel failed to raise his retardation as a viable defense."  State Habeas Record at 6.  After

---

[3]      Patrick F. McCann represented Martinez on state habeas review.  The Court will refer to Mr. McCann as "state habeas counsel."

testing by a court-appointed psychologist resulted in IQ scores well above the cut-off for mental retardation, state habeas counsel withdrew the *Atkins*-related claims.   On October 4, 2012, the trial-level habeas court entered findings of fact and conclusions of law recommending that the Texas Court of Criminal Appeals deny habeas relief.   State Habeas Record at 1160-86.   The Court of Criminal Appeals adopted the lower court's findings and conclusion and, after its own review, denied relief.   *Ex parte Martinez*, No. 42,342-03 (Tex. Crim. App. June 26, 2013). Federal review followed.

## MATTERS BEFORE THE COURT

Through appointed counsel, Martinez raises four claims in his federal petition for a writ of habeas corpus, all of which assert that trial counsel provided ineffective representation under *Strickland v. Washington*, 466 U.S. 668 (1984).   (Instrument No. 20).   A court reviewing a *Strickland* claim ask whether "a defense attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense."   *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).   Martinez contends that the trial representation failed to meet constitutional expectations when counsel:

1.   did not object under *Crawford v. Washington*, 541 U.S. 36 (2004) to a medical examiner's testimony about autopsies he had neither performed nor witnessed;

2.   did not present evidence that Martinez suffered from organic brain damage as a result of his exposure to organophosphate pesticides;

3.   did not object to allegedly improper questioning and argument by the prosecutor; and

4.   did not argue that Martinez was ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002).

Martinez's petition acknowledges that all but one of his claims come before the Court in a compromised procedural posture. Under 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"  Exhaustion "reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted).  Martinez concedes in his petition that he did not present his first three claims in state court.  Martinez, however, argues that jurisprudential principles should allow for full federal consideration of his unexhausted claims.

Respondent has filed an answer arguing that procedural and substantive law preclude habeas relief on Martinez's claims.  (Instrument No. 27).  Martinez has filed a reply.  (Instrument No. 28).  This matter is ripe for adjudication.  The Court will first address Martinez's exhausted claim before deciding whether federal procedure allows for judicial consideration of his remaining grounds for relief.

## THE CLAIM RAISED IN STATE COURT

Martinez's fourth claim faults trial counsel for not arguing that intellectual disability, formerly known as mental retardation,[4] precludes his execution.  The Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002) held that "death is not a suitable punishment for [an intellectually disabled] criminal."  *Id.* at 321.   The *Atkins* Court relied on standards provided by the psychological profession to define intellectual disability:

[Intellectual disability] refers to substantial limitations in present functioning.  It

---

[4]      The Supreme Court used the term "mental retardation in the *Atkins* decision.  Recent cases, however, have adopted the psychological community's current use of the term "intellectual disability."  *See Hall v. Florida,* ___ *U.S.* ___, 134 S. Ct. 1986, 1992 (2014).

is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. [Intellectual disability] manifests before age 18.

*Atkins*, 536 U.S. at 308 n.3 (quoting American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992)).  From this definition, courts have distilled three indispensable criteria for arriving at a diagnosis of intellectual disability: (1) significantly subaverage intellectual functioning; (2) related significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18.  *See Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008); *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

Martinez argues that his "previous attorneys made the determination that he was not mentally retarded based solely on IQ tests results administered much later in Mr. Martinez's life. They never retained an expert to determine whether Mr. Martinez had deficits in adaptive functioning as a result of an intellectual disability."  (Instrument No. 20 at 43).  Martinez alleges that constitutionally adequate trial preparation would have resulted in evidence relating to the first two prongs of *Atkins* tri-partite analysis.  Martinez relies on the following information to meet the first *Atkins* prong:

- a test administered by the Texas Department of Corrections at age 18 resulted in an IQ score of 65;

- Martinez performed poorly in school, repeating first grade three times and fifth grade once;

- Martinez received little education while in juvenile custody;

- testing by Martinez's expert on federal review, Dr. Paula Lundberg-Love, placed Martinez's reading ability at a fourth-grade level;

- Dr. Lundberg-Love opined that he had weak logical abstract thinking skills and little foresight;

- Texas Department of Corrections records noted cognitive problems, particularly with regard to logical and abstract reasoning.

(Instrument No. 20 at 40-41).  Martinez supports his argument relating to *Atkins'* second prong, existence of adaptive deficits, by pointing to: his history of problems in school, disturbed childhood, limited work experience, lack of close relationships, failure to evade authorities after committing crimes, reliance on others when engaging in criminal activity, and long-standing problems functioning normally in society.  (Instrument No. 20 at 43).  Martinez asks the Court to appoint a psychological expert so that he can develop additional evidence relating to his *Atkins* arguments.  (Instrument No. 20 at 44).

Martinez's petition, however, fails to provide a full background of his cognitive abilities and his prior intellectual testing.  In Martinez's initial round of federal review, the Court authorized factual development relating to his claim that he suffered from neurological impairment. Dr. Stephen Taylor Martin performed a neuropsychological evaluation in 2001, resulting in a Full Scale IQ score of 107, a Performance IQ of 97, and a Verbal IQ of 114—all scores considerably above the cut-off for mental retardation.  The defense's expert at the third sentencing hearing (Dr. Lundberg-Love) "considered accurate the 2001 intelligence testing[.]" State Habeas Record at 1163.  Trial counsel submitted an affidavit on habeas review explaining that the defense "review[ed] [Martinez's] voluminous records and court proceedings and consult[ed] with his mental health expert, Paula Lundberg-Love, Ph.D., who considered [Martinez] an intelligent individual."  State Habeas Record at 1163.  Also six assessments over twenty-two years determined that Martinez had "average intelligence," including a 1967

Weschsler Adult Intelligence Full Scale IQ score of 93 and testing from 1969 showing a "79 IQ." State Habeas Record at 1164-65.

In a state habeas hearing, counsel conceded that "Martinez is not retarded." State Writ Hearing at 4. State habeas counsel explained: "I'm here today to abandon[] the mental retardation claim. And of course as a result of that the claim regarding the failure to investigate evidence of mental retardation against [trial counsel], I believe that this is the fair thing to do." State Writ Hearing at 5. Because "the lack of a full-scale IQ score of 75 or lower is fatal to an *Atkins* claim." *Blue v. Thaler*, 665 F.3d 647, 658 (Tex. Crim. App. 2011), state habeas counsel "withdrew [Martinez's] . . . ground for relief alleging that [Martinez] is mentally retarded." State Habeas Record at 1162.

Even though the state habeas court recognized that it did "not need to consider [Martinez's] mental retardation claim," the state habeas court still adjudicated his allegation. State Habeas Record at 1163. The state habeas court credited trial counsel's decision that "mental retardation was not a viable defense to urge at the instant retrial." State Habeas Record at 1163. The state habeas court emphasized that "intelligence testing indicat[ed] that [Martinez] functioned at a level higher than that of a mentally retarded individual[.]" State Habeas Record at 1165. The state habeas court also extensively reviewed the factual indications of adaptive deficits, finding strong evidence of good adaptive skills. State Habeas Record at 1165-68. Based on its thorough review of the record, the state habeas court concluded that

> there is no credible evidence of mental retardation and no credible basis for believing that [Martinez] is a mentally retarded person in terms of the prevailing diagnostic standards. Further, [Martinez] fails to meet his burden to establish the criteria requisite to demonstrate that he is a mentally retarded individual and not eligible for the death penalty under *Atkins*.

State Habeas Record at 1168. Martinez "fail[ed] to demonstrate that he was a low IQ, much less

that [he] is mentally retarded." State Habeas Record at 1173. Thus, "trial counsel was not ineffective for failing to urge [Martinez's] alleged mental retardation." State Habeas Record at 1170.

Because the state habeas court adjudicated the merits of his ineffective-assistance claim, Martinez bears a heavy burden in seeking federal habeas relief. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S 356, 372 (2010). Even when engaging in a *de novo* review of *Strickland* claims, "the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). However, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id*. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id*. (internal quotation marks and citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The evidence before the state habeas court was so weak that state habeas counsel abandoned his claim that Martinez was intellectually disabled. By now cherry-picking information from the well-developed record, Martinez argues that trial counsel did not adequately investigate his mental condition. Martinez, however, provides no reason to suppose that additional investigation by counsel would have resulted in a picture much different from that drawn from the previous decades of testing. Importantly, Martinez gives the Court no reason to question the testing of his own expert during the first round of federal habeas review which conclusively placed his intelligence outside *Atkins*' protection. Given the extensive consideration of his intellectual ability in earlier proceedings, Martinez has not given the Court

any basis on which to question the reasonableness of the state habeas court's conclusion that trial counsel performed adequately in this regard.  *See* 28 U.S.C. §2254(d)(1).  The Court, therefore, will deny relief on Martinez's only exhausted ground for relief.

## THE UNEXHAUSTED CLAIMS

Martinez did not raise claims one through three in state court.   Federal habeas relief is not available to petitioners who have not exhausted state court remedies.  *See* 28 U.S.C. § 2254(b)(1).  An inmate who files a petition containing unexhausted claims usually cannot return to state court because Texas' abuse-of-the-writ doctrine (codified at Tex. Code Crim. Pro. art. 11.071 § 5) generally prohibits the filing of successive state habeas applications.  Accordingly, a procedural default results when an inmate advances for the first time in federal court a claim that the state courts would bar on procedural grounds.  *See Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) ("A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 734 n.1 (1991)); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (holding that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").  Because Martinez did not raise claims one through three previously, and could not do so now, a procedural bar forecloses federal review of those issues.

An inmate may overcome the procedural bar of his claims. The Supreme Court has noted that

[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal

habeas review of the claims is barred unless the prisoner can demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750 (emphasis added).   A petitioner bears the burden of making a sufficient showing that he can meet the standards to forgive procedural deficiencies.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999).

Martinez argues that he can show cause because his state habeas counsel did not raise the unexhausted claims in state court.   Until 2012, the Fifth Circuit did not allow deficient performance by habeas attorneys to forgive a procedural bar.  In *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2012), the Supreme Court recently found that ineffective assistance by a state habeas attorney may amount to cause under some circumstances.  *See Trevino v. Thaler*, ___ U.S ___, 133 S. Ct. 1911 (2013) (applying *Martinez* to cases arising from Texas courts).

Martinez contends that "[s]tate habeas counsel had an obligation to raise all potentially meritorious claims on [his] behalf."  (Instrument No. 20 at 22).  Yet merely showing that habeas counsel did not raise a claim is insufficient to qualify for the *Martinez* exception.  *See Smith v. Murray*, 477 U.S. 527, 535 (1986) ("'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.'") (quoting *Murray v. Carrier*, 477 U.S. 478, 486-87 (1986)).  An effective attorney does not raise every nonfrivolous claim.  *See Smith*, 477 U.S. at 536 (focusing on issues "more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy").   Instead, an inmate must: (1) prove that his habeas attorney's representation fell below the standards established in *Strickland* and (2) show that his underlying ineffective-assistance claim "has some  merit[.]"  *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318; *see also Crutsinger v. Stephens*, 540 F. App'x 310, 317 (5th Cir. 2013); *In re Sepulvado*, 707

F.3d 550, 556 n. 12 (5th Cir. 2013).  The Fifth Circuit has also recognized that a habeas attorney "'need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success[.]'"  *Vasquez v. Stephens*, ___ F.3d ___, 2015 WL 301181, at *___ (5th Cir. Jan. 23, 2015) (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000)).  Accordingly, to prove ineffective assistance of habeas counsel, a petitioner "must demonstrate that 'a particular nonfrivolous issue was clearly stronger than issues that counsel did present.'"  *Robbins,* 528 U.S. at 288.

The Court, therefore, will address Martinez's argument that habeas counsel should have raised each unexhausted ineffective-assistance-of-trial-counsel claim in state court.

### A.        Confrontation Clause (claim one)

Martinez contends that trial counsel should have objected to testimony by a medical examiner on confrontation clause grounds.  The confrontation clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him."  *Cruz v. New York*, 481 U.S. 186, 189 (1987) (quoting U.S. Const. amend. VI).  At the time of Martinez's conviction in 1989, *Ohio v. Roberts*, 448 U.S. 56, 63-66 (1980), and its progeny required that a reviewing court evaluate the admissibility of statements by evaluating whether the declarant was unavailable and whether the challenged testimony bore sufficient "indicia of reliability."  *See also Lilly v. Virginia*, 527 U.S. 116, 138 (1999); *Idaho v. Wright*, 497 U.S. 805, 816 (1990).

Before the retrial of Martinez's sentence, the Supreme Court issued *Crawford v. Washington*, 541 U.S. 36 (2005) that altered the manner in which courts evaluated the admissibility of out-of-court statements.   In *Crawford*, the Supreme Court held that "[t]estimonial statements of witnesses absent from trial" are admissible "only where the

declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]."   541 U.S. at 59.   While not comprehensively delineating which statements may be testimonial,[5] the *Crawford* court observed that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial[.]"   *Id.* at 56.

At the third punishment hearing, Dr. Albert Chu, an assistant medical examiner with Harris County, testified about what caused the death of five individuals Martinez had killed during his crime spree: Herman Chavis (the victim in the instant case); Julia Gonzales (Martinez's sister); Guillermo Chavez (his sister's boyfriend); Moses Mendez (a victim during another robbery); and Tina Pelkey (the prostitute Martinez killed).   Dr. Chu did not perform any of those autopsies and did not prepare the autopsy reports.   Tr. 23 at 59, 166, 177, 178.   Martinez argues that trial counsel should have objected to Dr. Chu's testimony as violating *Crawford*.

At the time of the punishment hearing, neither the United States Supreme Court nor the Texas Court of Criminal Appeals had specifically decided whether autopsy records were testimonial or non-testimonial under *Crawford*.   Intermediate Texas state appellate courts, however, had distinguished *Crawford* by concluding that the "sterile recitation of facts" in an autopsy report was non-testimonial.   *Campos v. State*, 256 S.W.3d 757, 762-63 (Tex. App. – Houston [14 Dist.] 2008); *see also Moreno Denoso v. State*, 156 S.W.3d 166 (Tex. App. –Corpus Christi 2005); *Mitchell v. State*, 191 S.W.3d 219, 221–22 (Tex. App. -San Antonio 2005, pet. ref'd).   The Texas Court of Criminal Appeals had cited those cases as recognizing a "distinction between official records that set out a sterile[,] routine recitation of an official finding or unambiguous factual matter . . . and a factual description of specific observations or events that

---

[5]        A testimonial statement "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact'" and includes "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Crawford*, 541 U.S. at 51-52.

is akin to testimony." *Segundo v. State*, 270 S.W.3d 79, 107 (Tex. Crim. App. 2008) (citing *Campos*, 256 S.W.3d at 761-62).

Martinez, however, claims that an extension of the Supreme Court's *Crawford* jurisprudence would treat autopsy reports as testimonial evidence. On June 25, 2009, the Supreme Court decided *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) which acknowledged that business records are "generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." 557 U.S. at 324. Nevertheless, the Supreme Court held that the statement of a lab analyst "prepared specifically for use at . . . trial" fell within the core class of testimonial statements. *Id.* In 2011, the Supreme Court in *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705 (2011), extended *Crawford* to testimony by a scientist relying on a forensic laboratory report that he did sign and about an experiment which he had not observed. Martinez claims that trial counsel should have objected to the witness' use of the autopsy reports because the *Melendez-Diaz* and *Bullcoming* decisions would consider that any "forensic certificates reciting test results are testimonial statements for Confrontation Clause purposes." (Instrument No. 20 at 10). Martinez argues that state habeas counsel's representation should provide cause for his failure to exhaust because he should have argued that, in a manner similar to *Melendez-Diaz* and *Bullcoming*, trial counsel should have argued that autopsy reports are testimonial under *Crawford*.

At the time of the third punishment hearing, no relevant case law placed autopsy reports within the purview of *Crawford*. In fact, by that point all Texas cases to consider the issue found that autopsy records were not testimonial. "Counsel is required to research facts and law and

raise meritorious arguments based on controlling precedent, but the law of this circuit is clear that counsel need not anticipate changes in the law or raise meritless objections." *United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009) (citations omitted); *see also Chaidez v. United States*, ___ U.S. ___, 133 S. Ct. 1103, 1111 (2013); *Debrow v. Cain*, 286 F. App'x 158, 160 (5th Cir. 2008); *Lucas v. Johnson*, 132 F.3d 1069, 1078-79 (5th Cir.1998).

Even though the Supreme Court issued *Melendez–Diaz* before Martinez's case was final on direct appeal, Martinez has not persuasively shown that it would prohibit the introduction of the autopsy reports in his case.   "*Melendez–Diaz* did not say one way or the other whether autopsy reports should be considered testimonial." *Hensley v. Roden*, 755 F.3d 724, 732 (1st Cir. 2014).   Accordingly, the application of *Melendez-Diaz* to autopsy records has not been uniform in Texas or nationwide.   Some courts have observed that in *Crawford* itself the Supreme Court "in no way—explicitly or implicitly—indicated that autopsy reports are testimonial in nature." *Hensley*, 755 F.3d at 732.   Most federal cases have held that an autopsy report is a non-testimonial business record. *See United States v. James*, 712 F.3d 79, 99 (2d Cir. 2013); *Mitchell v. Kelly*, 520 F. App'x 329, 331 (6th Cir. 2013); *McNeiece v. Lattimore*, 501 F. App'x 634, 636 (9th Cir. 2012); *United States v. De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 236 (2d Cir. 2006). At least one Supreme Court Justice has worried that courts would extend *Crawford* to "bar the admission of other reliable case-specific technical information such as, say, autopsy reports" which "could undermine, not fortify, the accuracy of factfinding at a criminal trial." *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 2251 (2012) (Breyer, J., concurring).

Some courts applying the logic of *Crawford* and its progeny have found that autopsy reports were testimonial. *See United States v. Ignasiak*, 667 F.3d 1217, 1231 (11th Cir. 2012).

Again, the Texas Court of Criminal Appeals has not expressly considered *Crawford*'s application to autopsy records.  Martinez points to cases from Texas intermediate appellate courts which "would have been obligated [the trial court] to apply the Supreme Court's holding in *Melendez Diaz*" to the autopsy records.  (Instrument No. 20 at 13) (citing *Woods v. State*, 299 S.W.3d 200, 208 (Tex. App. -Austin 2009); *Lee v. State*, 2013 Tex. App. LEXIS 15244 at 17 (Tex. App. - Houston  2013); *Martinez v. State*, 311 S.W.3d 104, 111 (Tex. App. - Amarillo 2010); *Herrera v. State*, No. 07-09-00335-CR 2011 Tex. App. LEXIS 7021, 2011 WL 3802231, at *1-*3 (Tex. App. - Amarillo 2011); *Gilstrap v. State*, No. 04-09-00609-CR, 2011 Tex. App. LEXIS 181, 2011 WL 192688, at 2-3 (Tex. App. - San Antonio 2011)).  Even those cases—all decided after Martinez's third punishment hearing—recognize that not "all autopsy reports are categorically testimonial."  *Wood*, 299 S.W.3d at 209.  Those cases require courts to "determine whether the primary purpose of the autopsy report was to establish or prove past events potentially relevant to later criminal prosecution."  *Martinez*, 311 S.W.3d at 111.  This reasoning comports with *Melendez–Diaz* which asked if the relevant records were created "for the purpose of establishing or proving some fact at trial." *Melendez–Diaz*, 557 U.S. at 324; *see also* *Bullcoming*, ___ S. Ct. ___, 131 S. Ct. at 2719–20 (Sotomayor, J., concurring) ("When the 'primary purpose' of a statement is 'not to create a record for trial,' 'the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" (quoting *Michigan v. Bryant*, 562 U.S. 344, ___, 131 S. Ct. 1143, 1155 (2011)).

Martinez does not argue that the autopsy reports in question were created specifically to be used in a criminal trial.  Thus, Martinez has not shown that trial counsel possessed a viable objection based on the application of *Crawford* and its progeny to the records used by Dr. Chu. While trial counsel could have made a *Crawford* objection, Martinez has not shown that, given

Texas state law at the time, the trial court would have excluded Dr. Chu's testimony.  With that unsure foundation, Martinez has not shown that state habeas counsel failed to raise a claim stronger than those contained in the habeas application.  Even when Martinez filed his state habeas application, on July 28, 2010, the unsettled state of federal law and conditional nature of the Texas intermediate appellate court's application of *Crawford* would not have provided a particularly strong argument for habeas relief.  *See United States v. McGhee*, 627 F.3d 454, 459 (1st Cir. 2010) (noting that the *Melendez–Diaz* Court was "sharply divided" and that the Supreme Court's "new slant on the Confrontation Clause is likely to be contested territory for some years").  Martinez has not raised a strong claim of ineffective representation by trial or habeas counsel.

Even if his prior attorneys should have raised a *Crawford* challenge, however, Martinez has not made a strong showing of actual prejudice.  Dr. Chu's reliance on the autopsy reports was far from the only—and not even the most convincing—evidence that Martinez had killed several individuals.  Martinez appeared before the jury as conclusively guilty of Chavis' murder.  A witness who was present at the murders testified that Martinez was the one who shot Chavis and others.  Martinez later bragged about the killings.  Another witness could at a minimum testify that Martinez was involved in the robberies.  The jury had to plug that testimony into a deeply aggravating life history containing decades of unremittingly violent acts.  Removing the autopsy reports from the evidentiary picture would not significantly alter the jury's consideration of Martinez's sentence.

Martinez has not shown a reasonable probability of a different result had trial counsel lodged a *Crawford* objection.  The Court, therefore, finds that Martinez has not overcome the procedural bar of his first ground for relief.

B.      **Organic Brain Damage (claim 2)**

Martinez faults trial counsel for not informing the jury that he had "suffered organic brain damage as a result of his and his mother's exposure to pesticides while trying to make a living in the cotton fields of South Texas and that this brain damage made it difficult for him to control his behavior[.]"  (Instrument No. 20 at 33).  Martinez bases this claim on evidence he developed during his initial federal habeas corpus action.   In his first habeas proceedings, Martinez complained that he suffered from organic brain damage caused by exposure to pesticides *in utero* and as a child.   This Court received evidence through evidentiary hearing and deposition testimony in which Dr. Lundberg-Love, Dr. Martin, and various fact witnesses described evidences of mental illness in Martinez's life.   Dr. Lundberg-Love observed a long history of symptoms and diagnoses of mental illness, including olfactory hallucinations, schizophrenia, and paranoia.  With most relevance to the instant proceedings, Dr. Lundberg-Love explained that Martinez "was exposed to highly neurotoxic organophosphate and chlorinated hydrocarbon pesticides because he and the members of his family worked as migrant farm laborers picking cotton across the state of Texas during 1945 to 1960, a time when such toxic pesticides were routinely used and workers were not educated about the dangers of such exposure."  (Instrument No. 20 at 25).  According to Dr. Martin, the exposure to pesticides caused organic brain damage that made Martinez aggressive and unable to control his impulses.

The Court, however, found no *Strickland* deficient performance or prejudice in trial counsel's failure to present organic-brain-injury evidence.  This Court observed that "Martinez' new evidence suggesting that he might have suffered from poor impulse control caused by organic brain damage raises some concerns." The Court, however, found that Martinez's evidence of impulsivity was discordant with the evidence showing his planning and commission

of the murder for which the jury convicted him.  While some of his crimes showed some measure of impulsivity, the court ultimately held that

> [i]nformation about brain damage and its effects on impulse control might have served to mitigate the jury's sense of Martinez' moral culpability for his extraneous offenses, many of which appear more impulse-driven than the Chavis murder.  Such evidence, however, is double-edged: While it might have had some mitigating value, it might also have increased the jury's sense of his future dangerousness because, according to Martinez' theory, his violence was caused by a permanent physical condition.  *See, e.g., Kitchens* v. *Johnson,* 190 F.3d 698, 703 (5th Cir. 1999).  Considering the evidence of Martinez' methodical planning and execution of the Long Branch robbery, the sheer brutality of his other offenses, and the double-edged nature of his new evidence, the state habeas court's conclusion that "the applicant cannot demonstrate that he was harmed by defense counsels' alleged deficient performance," *id.* at 28, was not unreasonable. Accordingly, Martinez is not entitled to relief on this claim.

(*Martienz v. Dretke*, 4:99-cv-3147, Instrument No. 93 at 28-29).

On appeal, the Fifth Circuit entered an order that summarily granted a Certificate of Appealability on Martinez's claim that trial counsel should have introduced evidence of his neurological impairment as a mitigating factor, but still denied habeas relief.  The Fifth Circuit observed that

> [a]lthough Martinez proffered expert testimony in 2003 that his exposure to pesticides in utero and through adolescence could have caused a brain disorder that rendered him unable to control his impulses, his own expert witness, Dr. Love, admitted that such a diagnoses would be no more than post-hoc conjecture otherwise contradicted by Martinez's mental health history as it stood in 1989.

*Martinez*, 404 F.3d at 889.  Nothing "suggested the viability of an insanity defense based on Martinez's exposure to neurotoxins in the course of migrant farm work" and "nothing in the mainstream media put counsel on notice of such a connection."  *Id.* at 889.

Most importantly, "counsel's decision not to introduce evidence of neurological impairment (i.e., organic brain damage) as mitigating evidence at the punishment phase constituted reasonable and protected professional judgment."  *Id.*  The Fifth Circuit has held that

"evidence of organic brain injury presents a 'double-edged' sword, and deference is accorded to counsel's informed decision to avert harm that may befall the defendant by not submitting evidence of this nature." *Id*. at 889-90.  The Fifth Circuit's review of the record indicated that "[t]he introduction of evidence that Martinez suffered from organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have substantiated the state's evidence and increased the likelihood of a future dangerousness finding." *Id*.  Thus, a reasonable attorney could conclude that "the availability of other, less damaging, mitigating evidence" would caution against presenting testimony that could harm the defense. *Id*. at 890.

Additionally, the Fifth Circuit found that Martinez could not show that not adducing evidence of poor impulse control attributable to organic brain damage caused a reasonable probability of a different result.  Any suggestion that pesticide exposure impaired Martinez's cognitive abilities conflicted with "evidence of Martinez's methodical planning and execution of the crime of conviction." *Id*.  "The evidence depicted a man capable of planning and executing criminal acts and victimizing anyone who would get in his way, which was more than sufficient to belie any 'tragic impulse' defense that Martinez could have asserted." *Id*.  "[E]ven if counsel had asserted the presumption and defense of insanity and presented evidence of neurological impairment in mitigation during Martinez's trial, it is highly improbable that the outcome would have been different." *Id*.

Trial counsel called Dr. Lundberg-Love as a witness at the retrial of his punishment.  Dr. Lundberg-Love testified that Martinez's mental-health records indicated that he "has difficulty controlling his behavior" and "was impulsive," Tr. Vol. 28 at 123, but did not connect those neurological impairments to pesticide exposure.  Martinez contends that trial counsel "has not

offered this as an explanation as to why they failed to present this evidence.  There is nothing in the record to indicate that trial counsel failed to present evidence of Mr. Martinez's organic brain damage because of its double-edged nature."  (Instrument No. 28 at 11).

The record lacks an explanation for trial counsel's decisions, primarily because Martinez did not raise the instant *Strickland* claim on state habeas review. Yet Martinez's federal claim does not introduce any fact not presented in his initial federal habeas action and does not suggest that additional inquiry would have seriously altered trial counsel's decisions about presenting mental-health testimony.  His recent allegations rely entirely on the record as it stood at the time of his retrial.  Nothing suggests that the attorney representing Martinez in his third punishment hearing was unaware of the record, particularly Dr. Lundberg-Love's knowledge of his alleged organic brain damage.  In fact, the extent of trial counsel's questioning suggests an impressive familiarity with the record.[6]

Even in the absence of explanation of trial counsel's specific strategic decisions, "*Strickland* directs courts to consider the conduct of defense counsel based on the objective standard of the reasonable attorney."  *Druery v. Thaler*, 647 F.3d 535, 540 (5th Cir. 2011).  Courts must determine "whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."  *Neal v. Puckett*, 239 F.3d 683, 687 (5th Cir. 2001).  In doing so, federal courts presume that defense counsel is competent and indulge a strong presumption that counsel's conduct is within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689; *Robison v. Johnson*, 151 F.3d 256, 260 (5th Cir. 1998).   Here, the Fifth Circuit court has already found that the underlying evidence of organic brain dysfunction was double-edged, leaving a reasonable attorney able to conclude not

---

[6]     Still, trial counsel presented some "evidence during the instant punishment retrial concerning [Martinez's] alleged mental health issues, and the jury was able to consider [his] evidence when deliberating their answers to the punishment special issues."  State Habeas Record at 1173-74.

to put it before a jury.  Also, the Fifth Circuit found no reasonable probability of a different result had trial counsel called the witnesses from the state habeas proceedings.  Martinez has not shown any factual or legal distinction in the proceedings before trial counsel that would alter the calculus performed by the Fifth Circuit in his initial federal proceedings.  Thus, state habeas counsel could rationally choose not to fault trial counsel's choice not to present the double-edged evidence.  As such, Martinez has not overcome the procedural bar of his organic-brain damage claim.

### C.    References to Martinez's Sexual Preferences (claim 3)

Martinez argues that trial counsel should have objected when "[t]he prosecutor . . . made references throughout the trial to Mr. Martinez's sexuality."  (Instrument No. 20 at 35).  "The references to Mr. Martinez's sexuality were pervasive throughout the trial and were often gratuitous and served no legitimate purpose."  (Instrument No. 20 at 35-36).  Martinez contends that the prosecution made such comments which "were merely designed to prejudice the jury against Mr. Martinez and to deny him a fair trial."  (Instrument No. 20 at 36).  Martinez asserts that trial counsel provided deficient performance by not making an objection to each instance.

Martinez's only points to five instances at trial in which the prosecution referenced Martinez's involvement in homosexual relations.  In the first instance, the prosecution asked Martinez's niece a question about when Martinez engaged in sexual acts with another man in front of her when she was eleven years old.  Tr. Vol. 25 at 127.  Trial counsel immediately objected.  In response, the prosecutor explained that the testimony was being offered as proof of a "bad act" because Martinez was "[c]ommitting a crime in front of her," but retreated by saying that "it was not something that I have to put in." Tr. Vol. 25 at 128.  The court then instructed the

jury to disregard the niece's answer.[7]

In the second, the prosecution questioned the girlfriend of a codefendant about when she ran away from home at a young age.  She eventually visited an apartment in Fort Worth where she met a man who "had a relationship with" Martinez.  Tr. Vol. 21 at 98-99.

Third, during the cross-examination of Dr. Paula Lundberg-Love the prosecution asked questions about the process of diagnosing mental illness.  Dr. Lundberg-Love had testified on direct that she diagnosed Martinez with schizophrenia.  Tr. Vol. 28 at 114.  She also had reviewed his decades-long mental-health history and related that he had previously been diagnosed with several disorders including chronic, underdifferentiated schizophrenia with paranoid, catatonic features; paranoid features; "psychopsychological disorders, low average intelligence, low self concept," and psychoneurosis.  Tr. Vol. 28 at 121, 125, 128.  The prosecution's cross-examination discussed various changes in the psychological profession's diagnostic manual during Martinez's long interaction with mental-health evaluations.  The prosecution asked: "there have been things that have been diagnosed as a mental disorder that are no longer a mental disorder, correct?  Such as homosexuality, right?"  Tr. Vol. 28 at 196.  In fact, Dr. Lundberg-Love identified other changes such as adding "a mathematic disorder," "male erectile disorder," and "caffeine induced disorder," but qualified that those did not represent her diagnosis of Martinez.  Tr. Vol. 28 at 197.

Fourth, during the prosecution's cross-examination of Dr. Lundberg-Love he used juvenile disciplinary records to emphasize Martinez's many acts of misconduct during his years

---

[7]     The trial court commented that he was "sure it it's going to be an issue on appeal[.]"  Tr. Vol. 25 at 12-29.  Martinez faults appellate counsel for not raising a claim relating to the niece's testimony about witnessing him engage in homosexual relations.  Like the other ineffective-assistance arguments, Martinez defaulted consideration of that issue by not raising it in state court.  At any rate, the Court finds that the prosecution's questioning in that instance was not so egregious that trial court's curative instruction could not remedy any error.

of incarceration.  While reviewing records from several years, the prosecution mentioned that juvenile custody records included "infraction of rules, details of escapes, attempted escapes, homosexual acts, use of drugs, [and] security treatment for mass escape involvement[.]"  Tr. Vol. 28 at 205.

Finally, the prosecution's questioning of Martinez's niece discussed various crimes and prison rule infractions Martinez told her about in letters.[8]  After discussing Martinez's "very" explicit recitation of sexual acts with a twelve-year-old girl that resulted in his incarceration, the prosecutor asked if Martinez had discussed "any sex acts he had in prison[.]"  Tr. Vol. 25 at 165. She testified that Martinez said: "He would force the prisoner for sex. . . . [H]e would hold the knife up to [the other prisoner's] neck and then he would tell them that blood on my knife or shit on my ding-a-ling."  Tr. Vol. 25 at 165.  During closing argument, the prosecution referenced the niece's testimony when chronicling Martinez's violent acts while incarcerated:

> You also know by the defendant's own words that he committed sexual assaults.
> "I even raped men, plural, in prison. I put a knife on their necks and said, 'Blood
> on my knife or shit on my ding-a-ling.'" These are anonymous victims. These are
> the victims we don't know who they are. And there is a long, long list of those
> nameless, faceless victims.

Tr. Vol. 31 at 73.

For the most part, the State's questions about Martinez's homosexuality were accurate, in light of the evidence, and were relevant to the State's case.  The prosecutor necessarily referred to homosexuality when discussing how Martinez bragged about prison rape and sexual acts that violated prison regulations.  The one comment about a "relationship" was minor, but descriptive of the circumstances viewed by a young runaway.  One question about the psychological profession's former consideration of homosexuality as mental illness, when in context, provided

---

[8]     In the letter, which the prosecution introduced into evidence in its entirety, Martinez described his consensual and nonconsensual homosexual and heterosexual relations.

background to the profession's evolving understanding of human mental conditions.   Each comment was incidental and, when properly contextualized, was not obviously intended to sway jurors against Martinez because of sexual orientation.

Even if the State had exceeded the bounds of permissible statements, those comments were not so egregious, pervasive, or prejudicial as to call into doubt the jury's answers to the special-issue questions.   The prosecution never tied together the incidental hints of Martinez's sexual preferences when summarizing the justifications for a death sentence. The prosecutor did not emphasize, accentuate, or needlessly belabor Martinez's sexual activity, other than with regard to the rapes he committed.   Even so, the overwhelming weight of Martinez's life-long violent acts far overpowers any incidental harm, such as it was.   The comments were an incidental and sporadic factor in the punishment phase and not a decisive consideration in the jury's decision making.   The Court finds that state habeas counsel was not ineffective for not raising a claim based on trial counsel's response to the prosecutor's references to homosexual relations.

### D.      Conclusion of Procedural Bar Discussion

Martinez has not shown that state habeas counsel's representation meets the *Martinez/Trevino* requirements for overcoming the procedural bar.  Martinez's failure to exhaust claims one through three in state court bars federal consideration of their merits and precludes habeas relief.

### E.      Alternative Review of the Merits

Even if Martinez could overcome the procedural bar of his claims, the Court finds that each unexhausted claim lacks merit. *See* 28 U.S.C. § 2254(b)(2) (stating that a federal habeas court may reject claims on the merits despite being unexhausted).  For the same reason that state

habeas counsel did not provide deficient performance, trial counsel's failure to object on the grounds specified in claims one through three did not amount to constitutionally inadequate representation.

Importantly, whether taken individually or cumulatively, the complained of errors did not actually prejudice Martinez. The prosecution presented an overwhelming case for a death sentence. The jury could prognosticate Martinez's future societal threat by tracing his violence through decades in and outside of prison. From a young age Martinez broke the law, often viciously threatening or harming others. His time in custody did not squelch his violent tendencies. Even when under the strictest levels of custody, Martinez assaulted others. Martinez claimed to have raped men in prison while threatening their lives. Martinez eschewed opportunities to reform. He displayed little sincere remorse for killings. The prosecution proved that Martinez has senselessly killed five people, including his own sister. Martinez claimed to have killed more. The instances in which Martinez argued that trial counsel should have objected to evidence would not have meaningfully altered the way in which the jury assessed his sentence. Martinez has not shown *Strickland* prejudice on his underlying claims. Martinez has not presented any claim which, if presented in a procedurally proper manner, would warrant habeas relief. The Court will alternatively deny each unexhausted claim.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b). Martinez has asked the Court to issue a Certificate of Appealability ("COA"). (Instrument No. 20 at 45). The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES

DISTRICT COURTS.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Settled precedent forecloses relief on Martinez's claims.  Because Martinez has not shown under the appropriate standard that any issue deserves appellate review, this Court will not certify any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Martinez has not shown an entitlement to federal habeas relief.  This Court **denies** Martinez's petition and **dismisses** this case **with prejudice**.   No Certificate of Appealability will issue in this case.

SIGNED at Houston, Texas, this 19th day of March, 2015.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE